Casey R. Fronk (Illinois Bar No. 6296535)
fronkc@sec.gov
Tracy S. Combs (California Bar No. 298664)
combst@sec.gov
Laurie E. Abbott (14577)
abbottla@sec.gov
Attorneys for Plaintiff Securities and Exchange Commission
351 South West Temple, Suite 6.100
Salt Lake City, Utah 84101
Tel.  801-524-5796
Fax: 801-524-3558

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> PLAINTIFF, <br><br> v. <br><br> GAYLEN DEAN RUST, an individual, and RUST RARE COIN, INC., a Utah corporation, <br><br> DEFENDANTS. | **MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANT GAYLEN DEAN RUST** <br><br> Case No.: 1:18-cv-00147-TC-CMR <br><br> Judge Tena Campbell <br> Magistrate Judge Cecilia M. Romero |

Pursuant to Federal Rule of Civil Procedure 55(b)(2), Plaintiff Securities and Exchange Commission (the "Commission") respectfully submits this Motion and Memorandum in Support of its Motion for Default Judgment Against Defendant Gaylen Dean Rust (herein, "Rust."). The Commission seeks this relief based upon Defendant's failure to respond to the allegations set forth in the Commission's November 15, 2018 Complaint as required by Federal Rule of Civil Procedure 12(a)(1)(A) and the entry of a certificate of default by the Clerk of the Court. The Commission respectfully requests, for the reasons set forth herein, that the court enter a default judgment in its favor against Rust.

## STATEMENT OF FACTS

### A.      Rust's Default

The Commission filed a Complaint in the above-captioned action against Rust on November 15, 2018. (Dkt. No. 2.) On November 28, 2018, Rust was served with the Summons and Complaint. (See Dkt. No. 5.) The affidavit of service on Rust was filed with the Court on November 28, 2018. (Dkt. No. 5.) Thus, Rust's answer or other responsive pleading was due on December 19, 2018. See FED. R. CIV. P. 12(a).

On December 17, 2018, Rust's counsel filed with the Court "Notices of Limited Appearance[s] for the Purpose of Informing the Court of Mr. Rust's Inability to Retain Counsel." (Dkt. Nos. 7, 8.) Rust failed to file any response to the allegations contained in the Commission's Complaint. On February 11, 2019, the Commission moved for the Clerk's entry of a default certificate against Rust. (Dkt. No. 13.) On March 5, 2019, the Clerk entered a

Default Certificate against Rust based on Rust's failure to plead or otherwise respond to the Commission's Complaint.  (Dkt. No. 14.)

To date, Rust has not pled or filed any response to the allegations contained in the Commission's Complaint.  No stipulation for an extension of time was entered into between the Commission and Rust allowing further time in which to respond to the Complaint.  Rust is not an infant or an incompetent person, nor is Rust in the military service of the United States.

**B.      Rust's Silver Bullion Trading Investment Scheme**

As alleged in the Commission's Complaint, for years Rust solicited investors to invest in a fraudulent silver bullion trading program, raising millions of dollars from investors across the country.  (Dkt. No. 2, Compl. ¶¶ 1, 2.)  Rust made material misrepresentations and omissions to investors regarding the amount of silver bullion he purportedly maintained for safekeeping for investors at Brink's Global Services USA ("Brink's"); his silver trading methods; his past performance investing in silver bullion; the use of investor funds; and the safety of the investment.  (Id. ¶ 3.)  In fact, Rust did not maintain any amount of silver bullion in storage at Brink's; was not employing the sophisticated silver trading strategies he advertised to investors; was not achieving the returns he represented to investors; and was putting investor funds at risk by spending them on his personal business and on himself and his family members.  (Id. ¶ 4.)

Rust, who managed the silver trading business of co-defendant Rust Rare Coin ("RRC"), solicited investors to invest funds in a purported investment based on the purchase and sale of silver bullion (the "silver trading program").  (Dkt. No. 2, Compl. ¶ 12.)  Rust made a number of representations to investors to solicit their investment in the program:  among other things, Rust represented that he traded only physical silver, rather than silver futures; that he used 100 percent of investor funds to buy silver; that he stored all the silver bullion that he purchased with investor

funds at Brink's in either Salt Lake City or Los Angeles, with 85 percent of investor silver being stored in Salt Lake City; that he traded with only half of the amount of silver he bought for each investor, and stored the other half in safekeeping; that he was storing nearly $80 million of silver at Brink's; that he conducted all silver trades through an account in the name of RRC at HSBC Bank Plc ("HSBC") by using an algorithm generated by HSBC; that he used the profit generated from this trading to repurchase silver at lower prices; that he never experienced a losing month of trading with the algorithm, and that he was averaging at least 20 to 25 percent returns annually; and that he did not charge a management fee, but instead compensated himself by keeping partial shares of silver left over from his trading.  (Id. ¶¶ 14–22.)

As part of the investment scheme, Rust also provided account statements to investors that purported to show the transactions Rust made in silver over a given month.  (Dkt. No. 2, Compl. ¶ 24.)  The statements further purported to show the profits generated from Rust's trades during the month, the total ounces of silver owned by a given investor at month's end, and the total value of the investor's holdings based on the price of silver at the time of the statement.  (Id. ¶ 24.) These statements, which consisted of Excel spreadsheets, were prepared by Rust and printed on the letterhead of RRC.  (Id. ¶ 25.)  Rust never filed or registered his offering of the investment, and the investment was offered and sold to investors who were not accredited within the meaning of the federal securities laws.  (Id. ¶¶ 45–46.)

In contrast to his representations to investors, Rust did not in fact store investor silver at Brink's.  (Dkt. No. 2, Compl. ¶ 30.)  Likewise, despite his representations regarding a trading account and sophisticated algorithm at HSBC, Rust never maintained an account with HSBC or used its algorithm to trade silver bullion.  (Id. ¶ 31.)   Indeed, Rust did not primarily use investor

funds to invest in silver bullion:  instead, as an example, from January 1, 2017 through August 2018, Rust took in approximately $85.7 million from investors, and of this:

- $70,243,523 was paid out in checks and wires in payments to earlier investors in the silver trading program;

- $2,667,700 was withdrawn in cash;

- $1,162,000 was transferred to Rust's entity R Legacy Racing, which Rust uses for his horse racing business;

- $9,165,969 was transferred to Rust's entity R Legacy Entertainment and its subsidiaries and used for payroll, vendors, equipment and other expenses related to Rust's music and production studio; and

- $2,039,994 was transferred to Rust's entity R Legacy Investment.

(Id. ¶¶ 32–33.)  In other words, approximately 99 percent of the deposits into Rust's silver trading scheme were used for purposes other than as represented to investors.  (Id. ¶ 33.)

### C.      The Parallel Criminal Action

On May 8, 2019, following the Commission's filing of its Complaint in this action, Rust was criminally indicted for wire fraud, money laundering, and securities fraud.  See United States v. Rust, 2:19-cr-00164-TS-CMR (D. Utah) at Dkt. No. 1, Indictment.  In this parallel criminal case, on December 20, 2021, Rust submitted a Statement in Advance of Plea, in which he gave notice of his intent to plead guilty to Counts 1, 2, and 4 of the Indictment, and further stipulated and agreed to specific facts regarding his perpetuation of the same fraudulent scheme as alleged in the Commission's Complaint.  Id. at Dkt. No. 134, Statement in Advance of Plea.

Specifically, Rust stipulated that he conspired to "defraud investors by inducing them to invest in RRC's 'silver trading program' through material misrepresentations and omissions of

material fact about the program," and then "used investor money for [his] own personal benefit

and took steps to conceal the conspiracy." Id. ¶ 11.  He further stipulated and agreed that he

"sold investments in RRC's silver trading program to approximately 500 investors located

throughout the United States and collected approximately $225 million from the same," id., and

"[t]o convince investors and potential investors that their investments were profitable and to

convince potential investors that the silver trading program was earning money, [he] used

investment money from later investors to pay the promised returns to earlier investors," such that

he "created the false impression that the silver trading program was profitable, that the

investments were safe and secure, and that the promised returns were being generated through

trading." Id.  And he admitted that "[i]n furtherance of the conspiracy, in order to achieve the

objects of the conspiracy, and in aiding and abetting the members of the conspiracy, [he] used

and caused the use of wire communications in interstate and foreign commerce and the United

States mails and commercial interstate carriers, to communicate with investors." Id.  On the

basis of these and other stipulated facts, Rust also admitted to "willfully and knowingly"

committing securities fraud. Id.  Furthermore, as part of his guilty plea in the criminal action,

Rust agreed to pay restitution to his 568 victims in the amount of $153,073,328.32, representing

the amount he obtained from the silver trading scheme. Id. at Dkt. No. 134, Statement in

Advance of Plea at 10.

On March 8, 2022, judgment was entered against Rust in the criminal action, and Rust

was sentenced to 228 months in prison, 36 months of supervised release, an assessment of $300,

and restitution of $153,073,328.32. Id. at Dkt. Nos. 155, 156.

**ARGUMENT**

Here, a default judgment against Rust is appropriate, because he has failed to answer the Complaint or appear in this action, and the uncontroverted allegations in the Complaint—along with his own stipulated admissions in the parallel criminal action—establish Rust's liability for violations of the federal securities laws.  Upon a defendant's default, the complaint's factual allegations are taken as true.  Tripodi v. Welch, 810 F.3d 761, 764 (10th Cir. 2016) ("[Upon default], a defendant admits to a complaint's well-pleaded facts and forfeits his or her ability to contest those facts."); see also Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981). As a result, all arguments on the merits of the matter are foreclosed.  Olcott v. Delaware Flood Co., 327 F.3d 1115, 1125 (10th Cir. 2003) (citing Jackson v FIE Corp., 302 F.3d 515, 525 (5th Cir. 2002) ("[D]efendant by his default, admits the plaintiff's well-pleaded allegations of fact, is precluded from challenging those facts by the judgment, and is barred from contesting on appeal the facts thus established.")).  And all theories of recovery alleged in the complaint are established.  See Cotton v. Slone, 4 F.3d 176, 181 (2d Cir. 1993).

Here, the well-pled allegations in the Complaint show that Rust violated the federal securities laws through his fraudulent silver-trading scheme.  Furthermore, Rust has admitted to the same facts in the parallel criminal action, which provide the basis for the Commission's claims here.  See SEC v. Credit Bancorp, Ltd., 738 F. Supp.2d 376, 395 (S.D.N.Y. 2010) ("Courts regularly find that, where [a] criminal action supersedes the resolution of the SEC's enforcement action, a defendant is collaterally estopped from relitigating issues in the civil forum.").  Thus, the law supports the Commission's requested remedies for these violations.

I.      **RUST VIOLATED THE FEDERAL SECURITIES LAWS.**

   A.      **Rust Violated the Registration Provisions of Section 5 of the Securities Act.**

First, the uncontroverted facts demonstrate Rust violated the registration provisions of

Section 5 of the Securities Act.  To establish a violation of the registration requirements of the

Securities Act, the Commission must demonstrate that a defendant, directly or indirectly, offered or

sold securities without a registration statement having been filed or in effect.  See SEC v.

International Chem. Dev. Co., 469 F.2d 20, 27 (10th Cir. 1972).  "The elements of [an] action for

violation of Section 5 are (1) lack of a registration statement as to the subject securities; (2) the offer

or sale of the securities; and (3) the use of interstate transportation or communication and the mails

in connection with the offer or sale."  Europe & Overseas Commodity Traders, S.A. v. Banque

Paribas London, 147 F.3d 118, 124 (2d Cir. 1998) (quoting In re Command Credit Corp., No. 3-

8674, 1995 SEC LEXIS 989, at *2 (S.E.C. Apr. 19, 1995)).

Scienter is not an element of a Section 5 violation.  See Aaron v. SEC, 446 U.S. 680, 714

n.5 (1980); SEC v. Johnston, No. 90-4189, 1992 U.S. App. LEXIS 17626 (10th Cir. July 28, 1996);

SEC v. Universal Major Indus. Corp., 546 F.2d 1044, 1046 (2d Cir. 1976); SEC v. Lybrand, 200 F.

Supp. 2d 384, 392 (S.D.N.Y. 2002).  Instead, Section 5 imposes strict liability on anyone who

directly or indirectly violates its plain terms.  See SEC v. Friendly Power Co., 49 F. Supp. 2d 1363,

1367 (D.D.C. 1997) (citation omitted); SEC v. DCI Telecomms., 122 F. Supp. 2d 495, 501

(S.D.N.Y. 2000) ("regardless of intent defendants violated Section 5"); SEC v. Current Fin. Servs.,

100 F. Supp. 2d 1, 5 (D.D.C. 2000) (Section 5 of the Securities Act imposes strict liability).

As set forth in the Complaint, the silver trading program investments offered and sold by

Rust are securities.  Rust never filed a registration statement as to those securities, and no exception

to the registration provisions apply here.  Securities Act Section 2(a)(1) and Exchange Act Section

3(a)(10) define the term "security" to include "investment contracts."  An investment contract

involves (1) an investment of money, (2) in a common enterprise, (3) with an expectation of profits

derived from the efforts of others.  SEC v. W.J. Howey Co., 328 U.S. 293, 298–99 (1946).  "This

definition 'embodies a flexible rather than a static principle, one that is capable of adaptation to

meet the countless and variable schemes devised by those who seek the use of the money of others

on the promise of profits.'"  SEC v. Edwards, 540 U.S. 389, 393 (2004) (quoting Howey, 328 U.S.

at 299); see also McGill v. American Land & Exploration Co., 776 F.2d 923, 925 (10th Cir. 1985),

citing Tcherepnin v. Knight, 389 U.S. 332, 336 (1967).  Here, the silver trading program

investments involved the investment of money, constituted a common enterprise in which investors

relied entirely on Rust's purported trading of silver bullion pursuant to an algorithm to obtain

profits; and any reasonable investor would have expected profits from the investment to be derived

solely from the efforts of Rust, or in other words "the efforts made by those other than the investor

are the undeniably significant ones."  Noa v. Key Futures, Inc., 638 F.2d 77, 79 (9th Cir. 1980).

Thus, Rust's offer and sale of these silver program investment contracts, through interstate

commerce, without a registration statement as to those securities and without a valid exception to

the filing of such statement,[1] was in violation of Sections 5(a) and 5(c) of the Securities Act.  (See

Dkt. No. 2, Compl. ¶¶ 40–46, 56–59.)

     **B.**     **Rust Violated the Anti-fraud Provisions of Section 17(a) of the Securities Act.**

     Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] prohibits (1) the employment of

devices, schemes, or artifices to defraud; (2) obtaining money or property by means of untrue

---

[1] Once the Commission establishes a *prima facie* Section 5 violation, the burden shifts to the
defendant to prove an exemption from registration applies.  SEC v. Ralston Purina Co., 346 U.S.
119, 126 (1953).  Here, Rust has provided no proof, or even argument, that any exemption
applied to the silver trading investment contracts.

statements of fact or omitting to disclose material facts; or (3) engaging in any transaction, practice, or course of business that operates as a fraud or deceit upon a purchaser, in the offer or sale of a security.  Here, Rust's fraudulent investment scheme violated each of these provisions.

### 1.      Securities Act Section 17(a)(1)

To be liable for a scheme to defraud under Section 17(a)(1), a defendant "must have engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme." Simpson v. AOL Time Warner, Inc., 452 F.3d 1040, 1048 (9th Cir. 2006), vacated on other grounds sub nom., Avis Budget Group Inc. v. Cal. State Teachers' Ret. System, 552 U.S. 1162 (2008).  Here, Rust's numerous false statements to investors, as alleged here and as admitted in the parallel criminal action, created the false impression that he was actually trading silver bullion, when in fact Rust was spending the money invested for personal expenses and making Ponzi payments to earlier investors. See SEC v. Wang, 2015 U.S. Dist. LEXIS 192319, *48 (C.D. Cal., Aug. 18, 2015) (citing United States v. Brown, 578 F.2d 1280, 1285 (9th Cir. 1978) (finding that "activities tending to lull investors, either to prevent discovery of fraud or to permit further fraudulent activities to progress unhindered have been held to constitute a part of the execution of the fraudulent scheme and to be integral to the offense rather than incidental to it.").

Securities Act Section 17(a)(1) requires a showing of scienter.  Aaron, 446 U.S. at 701–02.
The Supreme Court has defined scienter as "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976).  Reckless conduct satisfies the scienter requirement. Edward J. Mawod & Co. v. SEC, 591 F.2d 588, 595–97 (10th Cir. 1979). Here, the uncontroverted evidence (including Rust's admission, in the parallel criminal case, that he "willfully and knowingly" committed securities fraud) shows that Rust knew that his false representations to investors were not true. (See Dkt. No. 2, Compl. ¶ 39.)  Indeed, the fact that Rust

10

spent investor funds on personal expenses, by itself, "establishes the requisite state of mind for committing securities fraud." Lowry v. SEC, 340 F.3d 501, 505 (8th Cir. 2003). And where a defendant operates a Ponzi scheme, as here, the "question of intent to defraud is not debatable." Conroy v. Shott, 363 F.2d 90, 92 (6th Cir. 1966); see also In re Agricultural Research and Tech. Grp., Inc., 916 F.2d 528, 535 (9th Cir. 1990) ("[A] debtor's actual intent to hinder, delay or defraud its creditors may be inferred from the mere existence of a Ponzi scheme").

### 2.    Securities Act 17(a)(2)

Section 17(a)(2) of the Securities Act prohibits in the offer or sale of securities, obtaining money or property by means of any material misstatement or omission. See 15 U.S.C. § 77q(a). Unlike Section 17(a)(1), violations under Section 17(a)(2) require only a showing of negligence. Aaron, 446 U.S. at 701–02. To establish negligence, the Commission must show that a defendant failed to conform to the standard of care that would be exercised by a reasonable person. See SEC v. Dain Rauscher, Inc., 254 F.3d 852, 856 (9th Cir. 2001); SEC v. Hughes Capital Corp., 124 F.3d 449, 453–54 (3d Cir.1997) (defining negligence in the securities context as the failure to exercise reasonable care or competence). As previously discussed, Rust at a minimum—and as he stipulated in the parallel criminal action—made false statements with knowledge they were false, and it is undisputed that Rust himself received over $150 million dollars from investors as a result of his false statements and omissions.

The misstatements and omissions in this case are also undoubtedly material.[2] Misrepresentations regarding the use of investor funds are material. See SEC v. Merrill Scott &

---

[2] A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. See Basic Inc. v. Levinson, 485 U.S. 224, 231–32 (1988); TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976). Liability arises not only from affirmative representations but also from failures to disclose material information. Dain Rauscher, 254 F.3d at 855–56. The antifraud provisions impose "'a duty to disclose material

Assocs., Ltd., 2011 U.S. Dist. LEXIS 134010, at *41–42 (D. Utah Nov. 21, 2011) (failure to disclose that funds were being misappropriated and used for purposes other than those stated in solicitations were material); SEC v. Chemical Trust, 2000 U.S. Dist. Lexis 19786 (S.D. Fla. 2000) (use or misuse of investor proceeds is material).  It cannot be disputed that any reasonable investor would consider it important to know that the money invested in Rust's silver trading program was not used to trade silver, but was instead used to make payments to other investors and promoters, and pay the personal (and luxury) expenses of Rust and his family.  These misstatements were also "in the offer or sale" of securities under Section 17(a)(2) of the Securities Act because they were made to investors at the time Rust was offering and selling the silver trading investment contracts and when investors were deciding to invest.  (See Dkt. No. 2, Compl. ¶¶ 30–37, 50–52.)

### 3.    Securities Act 17(a)(3)

Section 17(a)(3) prohibits engaging in any transaction, practice, or course of business that operates as a fraud or deceit upon a purchaser, in the offer or sale of a security.  See 15 U.S.C. § 77q(a).  As with Section 17(a)(2), only negligence is required to violated this section.  Aaron, 446 U.S. at 701–02.  Thus, for the same reasons as described above, Rust's fraud in connection with the silver trading program investment scheme violated Section 17(a)(3).  (See Dkt. No. 2, Compl. ¶¶ 50–52.)

### C.    Rust Violated the Anti-Fraud Provisions of Exchange Act Section 10(b) and Rule 10b-5.

Finally, and for the same reasons as discussed above, Rust violated the anti-fraud provisions of Section 10(b) of the Exchange Act and Rule 10b-5.  Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5] prohibit defendants from,

---

facts that are necessary to make disclosed statements, whether mandatory or volunteered, not misleading.'"  SEC v. Fehn, 97 F.3d 1276, 1290 n.12 (9th Cir. 1996) (quoting Hanon v. Dataproducts Corp., 976 F.2d 497, 504 (9th Cir. 1992)).

with scienter: employing devices, schemes, and artifices to defraud; making untrue statements of material fact and omissions; and engaging in acts, practices, and course of business which operate as a fraud and deceit, in connection with the purchase and sale of securities.   Here, as previously described, Rust willfully and knowingly made material false statements and omissions to investors, used Ponzi payments to deceive investors into believing that his false statements regarding his trading of silver bullion were true, but in fact used the money invested to pay for personal expenses. (See Dkt. No. 2, Compl. ¶¶ 53–55.)

## II.     THE COMMISSION IS ENTITLED TO THE INJUNCTIVE RELIEF IT SEEKS.

The Commission seeks a final judgment permanently enjoining Rust from future violations of Sections 5(a), 5(c), and 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5 thereunder.

Section 20(b) of the Securities Act and Section 21(d) of the Exchange Act grant to the Commission the authority to seek injunctive relief when it appears, upon proper showing, "that any person is engaged or is about to engage in acts or practices constituting a violation of any provision [of the Acts]."  15 U.S.C. § 77t(b); 15 U.S.C. § 78u(d)(1).  Foremost among these circumstances is the past illegal conduct of the defendant, from which the Court may infer the likelihood of future violations.  SEC v. Mgmt. Dynamics, Inc., 515 F.2d 801, 808 (2d Cir. 1975). Past conduct amounting to "systematic wrong doing rather than an isolated occurrence" may be "particularly appropriate" for permanent injunction.  SEC v. Milan Capital Group, Inc., No. 00 CIV 108, 2000 U.S. Dist. LEXIS 16204 at *28 (S.D.N.Y. November 9, 2000).  Other factors to consider in enjoining a defendant for security violations include the defendant's degree of scienter and the defendant's acknowledgement of his misconduct.  SEC v. Commonwealth Chem. Sec., Inc., 574 F.2d 90, 100 (2d Cir. 1978).

In this case, the nature of Rust's conduct, as outlined in the Commission's Complaint and as stipulated to by Rust in the parallel criminal action, clearly demonstrates the need for a permanent injunction to deter Rust from future violations of the federal securities laws. As previously discussed, Rust, for almost a decade prior to the filing of the Commission's Complaint, ran a massive Ponzi scheme premised on deceiving investors into believing that he was running a legitimate trading program for silver bullion. Rust has not acknowledged his misconduct in this case or even appeared in this action. Thus, absent the Commission's injunctive relief, there is a high likelihood that Rust will engage in future violations of the securities laws. See SEC v. Art Intellect, Inc., No. 2:11-CV-357, 2013 U.S. LEXIS 23132, at *69 (D. Utah March 6, 2013).

## III.    RUST SHOULD BE ORDERED TO PAY DISGORGEMENT AND PREJUDGMENT INTEREST.

As part of the default judgment, the Commission also requests that the Court require disgorgement of Rust's ill-gotten gains, along with pre-judgment interest. It is well settled that the Commission may seek, and courts may order, disgorgement of ill-gotten gains in Commission injunctive actions. SEC v. Manor Nursing Ctrs. Inc., 458 F.2d 1082, 1104 (2d Cir. 1972); SEC v. Intelliquis Int'l., Inc., No. 2:02-CV-674 PGC, 2003 U.S. Dist. LEXIS 27131 at *50 (D. Utah, Dec. 11, 2003) ("The decision whether to award disgorgement, as well as the amount, is in the broad discretion of the court."). "A disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under [15 U.S.C.] § 78u(d)(5)." Liu v. SEC, 140 S. Ct. 1936, 1942 (2020). See also 15 U.S.C. § 78u(d)(7) ("In any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement.")

In determining a proper disgorgement amount, the Commission need only produce a reasonable approximation of the defendant's ill-gotten gains. SEC v. Platforms Wireless Int'l

Corp., 617 F.3d 1072, 1096 (9th Cir. 2010) (quoting SEC v. First Pac. Bancorp., 142 F.3d 1186,

1191 (9th Cir. 1998)); see also SEC v. Liu, No. SACV 16-00974-CJC (AGRx), 2021 WL

2374248 (C.D. Cal. June 7, 2021) (applying Liu and granting the Commission's motion for

disgorgement of defendants' net profits from their illegal activities); SEC v. Maxxon, Inc., 465

F.3d 1174 (10th Cir. 2006).  Upon the Commission's production of a reasonable approximation

of a defendant's ill-gotten gains, the burden shifts to the defendant to demonstrate that the

Commission's estimate is not reasonable.  Platforms Wireless, 617 F.3d at 1096 (quoting SEC v.

First City Fin. Corp., Ltd., 890 F.2d 1215, 1232 (D.C. Cir. 1989)).  Courts resolve ambiguity in

the calculation against the defrauding party.  First City Fin., 890 F.2d at 1232; SEC v. Carnicle,

Case No. 1:95-CV-110(C), 1999 U.S. Dist. LEXIS 23379 at *10 (D. Utah, Sept. 20, 1999).

Here, Rust has admitted and stipulated in the parallel criminal action that he obtained at least

$153,073,328.32 from over 500 investors in his fraudulent silver bullion trading scheme, which

is a reasonable approximation of his ill-gotten gains from his misconduct.[3]

The Commission also requests that the Court award prejudgment interest on the

disgorgement of Rust's ill-gotten gains.  The decision of whether to order prejudgment interest,

like the decision to grant disgorgement and in what amount, is left to the broad discretion of this

court.  First Jersey Sec., Inc., 101 F.3d at 1476.  Requiring the payment of interest prevents a

defendant from obtaining the benefit of "what amounts to an interest free loan procured as a

result of illegal activity."  SEC v. Moran, 944 F. Supp. 286, 295 (S.D.N.Y. 1996).  "In deciding

---

[3]  As the requested disgorgement here overlaps with the restitution ordered in the parallel
criminal case and the remedies in another parallel case against Rust brought by the Commodity
Futures Trading Commission and the State of Utah Division of Securities, *see CFTC et al. v.
Rust*, 2:18-cv-00892 (D. Utah), Commission staff will coordinate with these parties and with the
receiver appointed in *CFTC v. Rust* to determine the best and most efficient way to distribute any
monies collected from Rust to the victims of his fraudulent scheme.

whether an award of prejudgment interest is warranted, a court should consider '(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court.'  In an enforcement action brought by a regulatory agency, the remedial purpose of the statute takes on special importance." First Jersey Sec., Inc., 101 F.3d at 1476 (citations omitted).

Here, the appropriate measure for prejudgment interest is one based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2).  See Platforms Wireless, 617 F.3d at 1099.  Thus, in addition to disgorgement, it is appropriate for Rust to be required to pay prejudgment interest in the amount of $22,267,292.27 running from November 15, 2018 (the date of the filing of the Commission's complaint) to April 27, 2022 (the date of judgment).  (See Ex. 1, L. Abbott Decl. at ¶ 3 & Ex. A.)

## III.    RUST SHOULD BE ORDERED TO PAY A THIRD-TIER CIVIL PENALTY

Rust should additionally be ordered to pay a civil monetary penalty.  The Securities Act and the Exchange Act thus permit the Commission to seek civil penalties for each violation of the federal securities laws.  15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3).  This is because, as courts have recognized, "[d]isgorgement alone" may be "an insufficient remedy" as "there is little deterrent in a rule that allows a violator to keep the profits if [he] is not detected, and requires only a return of ill-gotten gains if [he] is caught."  SEC v. Inorganic Recycling Corp., Fed. Sec. L. Rep. P 92, 269 (S.D.N.Y. 2002).

Like a permanent injunction, civil penalties are imposed to deter the wrongdoer from similar misconduct in the future.  Accordingly, the factors considered to determine the likelihood of future violations for the purposes of a permanent injunction are also useful in assessing civil

16

penalties.  SEC v. Smart, 2011 U.S. Dist. LEXIS 61134 at 55 (D. Utah 2011) (citing SEC v. Brethen, 1992 U.S. Dist. LEXIS 20665 at 104 (S.D. Ohio 1992)).  When determining the appropriate civil penalty to impose, the Smart court recognized and examined three salient factors identified originally in SEC v. Youmans: (i) the egregiousness of the violations, (ii) the isolated or repeated nature of the violations, and (iii) the degree of scienter involved.  SEC v. Youmans, 729 F.2d 413, 415 (6th Cir. 1984); see also SEC v. Deyon, 977 F. Supp. 510, 519 (D. Me. 1997) (imposing $75,000 penalty against Defendant based on his "fraudulent" conduct).

A third-tier penalty is appropriate where, as here, the violations (1) involve "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement", and (2) "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. §§ 77t(d)(2)(c); 78u(d)(3)(b)(iii).  Furthermore, in determining whether to assess civil penalties, a court may consider evidence of a defendant's overall conduct, including conduct that is not directly related to the violations at issue.  For example, in SEC v. Moran, 944 F. Supp. 286, 296 (S.D.N.Y. 1996), the court considered the defendant's refusal to recognize the seriousness of his violations in deciding to impose civil penalties under the remedies act.

As set forth above, the facts show that a third-tier civil monetary penalty is appropriate under 15 U.S.C. § 77t(d)(2)(c) and § 78u(d)(3)(b)(iii).  For years, Rust repeatedly induced investors with misrepresentations and omissions of material facts to participate in Rust's silver trading investment scheme.  Rust made these basic misstatements and omissions with a high degree of scienter, and then used the investor money to make Ponzi payments and for his own personal expenses.  Furthermore, Rust's actions created a substantial threat of loss to investors, who invested—as Rust himself admitted in the parallel criminal action—at least $225 million

17

into his scheme. Examination of the <u>Youmans</u> factors with the above facts supports imposing a third-tier civil penalty.

The specific amount of the civil penalty imposed within each statutory penalty tier is discretionary.  <u>See Olins</u>, 769 F. Supp. 2d at 1199 (citing <u>SEC v. Moran</u>, 944 F. Supp. 286, 296–97 (S.D.N.Y. 1996)).  Each tier provides that a penalty cannot exceed the greater of either a specific statutory amount, or "the gross amount of pecuniary gain to such defendant as the result of the violation." 15 U.S.C. § 78u(d)(3)(B).  For third-tier penalties involving violations that occurred after November 2, 2015, and are imposed after January 15, 2022, the statutory amount adjusted for inflation is $207,183 for natural persons.  <u>See</u> Release Nos. 233-11021; 34-93925, dated January 6, 2022 (effective January 15, 2022).   This Court should, therefore, impose an appropriate third-tier civil penalty on Rust for violating the federal securities laws.

**<u>CONCLUSION</u>**

For the foregoing reasons, this Court should grant the Commission's Motion for Entry of Default Judgment against Defendant Gaylen Rust.

Dated this 27th day of April, 2022.

Respectfully submitted,


  _/s/ Casey R. Fronk_____
Casey R. Fronk
Tracy S. Combs
Attorneys for Plaintiff Securities and Exchange
Commission

**CERTIFICATE OF SERVICE**

I hereby certify that on the 27th day of April, 2022, I caused to be filed the foregoing

using the Court's CM/ECF System.  A true and correct copy of the document was served on all

parties entitled to service through the Court's CM/ECF System.

In addition, a courtesy copy of the document was served via EMAIL to:

> Joseph M.R. Covey
> PARR BROWN GEE & LOVELESS, P.C.
> 101 South 200 East, Suite 700
> Salt Lake City, UT 84111
> jcovey@parrbrown.com
> *Counsel to Jonathan O. Hafen, Court-Appointed Receiver*
> *for Defendant Rust Rare Coin, Inc.*

*/s/ Casey R. Fronk*
Casey R. Fronk
